In re Barry W. EISAMAN, Debtor.

Charles W. GRANT, Trustee, Plaintiff,

v.

CITIZENS FIRST BANK OF OCALA, Defendant.

Bankruptcy No. 87–1368–BKC–3P7. Adv. No. 88–22.

United States Bankruptcy Court, M.D. Florida, Jacksonville Division.

Sept. 9, 1988.

Ronald Bergwerk, Jacksonville, Fla., for plaintiff.

Valarie J. Hall, Jacksonville, Fla., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GEORGE L. PROCTOR, Bankruptcy Judge.

This adversary proceeding is brought to determine the validity, priority and extent of a lien in accounts receivables owing to the debtor. Both parties have filed motions for summary judgment which were heard August 9, 1988. Based upon the pleadings, evidence, and stipulation of facts, the Court enters these Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

The debtor, Barry W. Eisaman, was the principal of a business known as Paperchase Farm, Inc., which specialized in caring for breeding and racing stock (thoroughbred horses) owned by it and third persons. The debtor was a veterinarian who cared for the horses at the Paperchase Farm and at other horse farms. During the time that the corporation was in business, the services were billed under the name "Paperchase Farm, Inc., 9580 Northwest Highway 225–A, Ocala, Florida, 32675." The debtor resided at the Paperchase Farm until April, 1986.

In late 1986 or early 1987, the debtor closed the Paperchase Farm bank account and opened up a new account in his own name. He then began billing for his services as well as those being provided by Paperchase Farm, Inc., under the name "Barry Eisaman and Associates, P.O. Box 130, Orange Lake, Florida, 32681." The Orange Lake billhead contained a different phone number than the Ocala billhead. Around April, 1987, the debtor began billing his services as well as those provided by Paperchase Farm, Inc., under the name "Barry W. Eisaman, V.M.D.," showing the Orange Lake address and phone number.

In approximately July, 1987, the remaining horses being boarded at Paperchase Farm were shipped from the farm and on September 2, 1987, the debtor filed a petition for relief under Chapter 7 of the Bankruptcy Code. At the date of the petition, there were a number of accounts receivable which have since been collected by the plaintiff. These receivables fall into four categories:

A. Accounts generated for stabling and care of horses at Paperchase Farm billed by Paperchase Farm.

B. Accounts generated for veterinary services billed by Paperchase Farm for horses located elsewhere.

C. Accounts generated by the stabling and care of horses at Paperchase Farm billed by the debtor.

**530**

D. Accounts generated for veterinary services billed by the debtor for horses not at Paperchase Farm.

Defendant claims a security interest in all of these accounts, including those services billed after debtor left Paperchase Farm, Inc. The UCC–1 financing statement which evidences this security interest lists "Paperchase Farms, Inc." as the debtor and contains no reference to any other debtors.

On July 12, 1988, the defendant moved for partial summary judgment on its counterclaim and on September 1, 1988, the Court entered a judgment in its favor. The Court's order specifically found that the bank had a valid perfected security interest in and to (i) the accounts generated for stabling and care of horses at Paperchase Farm billed by Paperchase Farm; (ii) the accounts generated for veterinary services billed by Paperchase Farm for horses located elsewhere; and (iii) the accounts generated by the stabling and care of horses at Paperchase Farm billed by the debtor.

The remaining issue is whether those accounts generated for veterinary services billed by the debtor for horses not at Paperchase Farm are subject to the bank's security interest.

## CONCLUSIONS OF LAW

■ The rights of the parties to this adversary proceeding are governed by Chapter 679, *Florida Statutes.* Section 679.402(1) of that statute provides:

A financing statement is sufficient if it gives the names of the debtor and the secured party, is signed by the debtor, gives an address of the secured party from which information concerning the security interest may be obtained, gives a mailing address of the debtor, and contains a statement indicating the types, or describing the items, of collateral....

Sub-section (6) of that same statute was added in 1972 and provides:

A financing statement sufficiently shows the name of the debtor if it gives the individual, partnership, or corporate name of the debtor, whether or not it adds other trade names or names of part-

ners. Where the debtor so changes his name or in the case of an organization its name, identity, or corporate structure that a filed financing statement becomes seriously misleading, the filing is not effective to perfect a security interest in collateral acquired by the debtor more than four months after the change, unless a new appropriate financing statement is filed before the expiration of that time, in which case the new filing shall continue the priority of the original filing. A filed financing statement remains effective with respect to collateral transferred by the debtor even though the secured party knows of or consents to the transfer.

Sub-section (7) then adds:

A financing statement substantially complying with the requirement of this section is effective even though it contains minor errors which are not seriously misleading.

It cannot be disputed that the financing statement filed by the defendant is ineffective as to collateral owned by Barry W. Eisaman individually. This is specifically provided for under § 679.105(1)(d), Florida Statutes. That section reads in relevant portion: "Where the debtor and the owner of the collateral are not the same person, the term 'debtor' means the owner of the collateral...."

In order for the financing statement filed by the defendant to be effective as to these accounts, Paperchase Farms, Inc., must be the owner of the accounts receivable generated by Barry W. Eisaman, V.M.D. It is not. Once the debtor moved from the Paperchase Farm location and opened up an office in his own name, he was no longer an employee of the corporation. Because the UCC–1 financing statement fails to contain the name and mailing address of the new entity, Barry Eisaman, V.M.D., the bank's perfected security interest in those accounts, if any, lapsed and the financing statement became ineffective against subsequent purchasers or lienholders. By virtue of 11 U.S.C. § 544 (a)(1), the bank's

interest is therefore subordinate to that of the bankruptcy trustee.

Defendant relies upon the opinion of *Hatfields & McCoys, Inc. v. First Tampa Capital Corp.*, 4 UCC Rep Serv 2d 1234, 78 B.R. 312 (Bkrptcy.N.D.Fla.1987). There, Judge Killian determined that collateral transferred without the creditor's knowledge immediately prior to the filing of the bankruptcy petition remained subject to a pre-existing security interest without the necessity of having to file a new financing statement. The Court finds that defendant's reliance on that case is misplaced.

In *Hatfields*, the debtor transferred restaurant equipment owned individually by the president of the debtor corporation to the corporation in exchange for an assumption of the secured debt. The transfer occurred less than sixty days prior to a decision to file a Chapter 11 petition and was done without the consent of creditors. The Court found that under the circumstances, it would be inequitable to defeat the security interest so as to benefit the transferee. The Court noted that the transfer in question constituted a crime under Florida law and that a contrary holding would permit "the unscrupulous debtor to engage in surreptitious bankruptcy planning and thereby divest the secured party of its collateral."

That is hardly the case here. In the first place, all of the property subject to the bank's security interest remains with the original obligor. There has been no transfer and the bank continued to collect upon those accounts after the business had closed. Secondly, the debtor in this case ceased working exclusively for the corporation nearly a year and a half prior to the petition date. There is no evidence he was engaged in "surreptitious bankruptcy planning" on the eve of bankruptcy.

Finally, the only accounts in issue are those generated by the debtor's personal services which in no way relate to the property or services of Paperchase Farm, Inc. To suggest that an individual cannot leave the employ of a corporation and thereafter sell his personal services is a step the Court is unwilling to take, even where that individual is the principal shareholder. The debtor in *Hatfields* was obviously trying to exploit a gap in the law to gain an unmerited windfall. The debtor in this proceeding was a man selling services in order to obtain a "fresh start." The policy considerations present in *Hatfields* are simply not present here.

■ The Court finds further that even if the receivables were owned by Paperchase Farm, Inc., the financing statement would still be ineffective against the trustee due to the fact that it is seriously misleading. Most courts, including this one, would hold that the filing of a financing statement under any name other than the debtor's correct name is a major error. It is seriously misleading. *See e.g.*, *In re A–1 Imperial Moving and Storage Co., Inc.*, 350 F.Supp. 1188 (S.D.Fla.1972). In this case, it could not be seriously argued that a hypothetical creditor of Barry W. Eisaman, V.M.D., of Orange Lake, Florida, would be alerted to check for filing against Paperchase Farm, Inc., of Ocala.

Finally, § 679.402(6) is designed to remedy situations such as these by allowing a creditor to protect its priority status upon filing a new financing statement within four months of any name change. The defendant has failed to do this. Under § 544(a)(1) of the Bankruptcy Code, the trustee has priority over any such security interest.

The Court finds that the plaintiff is entitled to prevail on its motion for summary judgment. The Court will separately enter a summary final judgment.